IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MICHAEL THORNE,                         )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )     Case No. 00-0913-CV-W-6
                                        )
SPRINT/UNITED MANAGEMENT  )
COMPANY, et al.,                        )
                                        )
          Defendants.                   )

## MEMORANDUM AND ORDER

## V.     INTRODUCTION

Plaintiff, Michael Thorne, instituted this employment discrimination suit against

defendants, Sprint/United Management Company, and Sprint Spectrum, L.P. (hereinafter

collectively referred to as "Sprint" or "defendants") under Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Missouri Human Rights Act

("MHRA"), V.A.M.S. § 213.010 *et seq.*  In Counts I and III, plaintiff alleges that defendants

violated Title VII and the MHRA when defendants' employee, Rob Hammond, sexually

harassed plaintiff, and created a hostile work environment.  In Counts II and IV, plaintiff

alleges that defendants retaliated against plaintiff in violation of Title VII and the MHRA.  In

Counts V and VI plaintiff states claims for negligent training and negligent supervision.

Pending before the court is defendants' Motion for Summary Judgment, defendants'

Suggestions in Support, plaintiff's Suggestions in Opposition, and defendants' Reply.  For the

reasons set forth below, defendants' motion for summary judgment is granted in part and denied in part.


**VI.     SUMMARY JUDGMENT STANDARDS**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467 (1962); Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party, and it must give that party the benefit of all reasonable inferences to be drawn from the evidence. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir.1999).

A party seeking summary judgment bears the initial burden of demonstrating to the court that an essential element of the non-moving party's case is lacking. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden then shifts to the non-moving party to come forward with sufficient evidence to demonstrate that there is a factual controversy as to that element, or to explain why such evidence is not currently available. Id.; Fed. R. Civ. P. 56(e). In resisting summary judgment, the non-moving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); see also 10A C. Wright et al,

Federal Practice and Procedure §§ 2739, 2727 (1983).  In other words, the non-movant must do more than merely assert that there is a genuine issue of material fact.

However, parties to a summary judgment motion will carry different evidentiary burdens based on where the ultimate burden of proof falls on a particular issue at trial.  When the moving party bears the burden of persuasion on the issue at trial, such as when the movant is a plaintiff or the claim is an affirmative defense, it must sustain that burden *as well as* demonstrate the absence of a genuine dispute.  See  Lawyer v. Hartford Life & Accident Ins. Co., 100 F.Supp.2d 1001, 1008 (W.D. Mo. 2000).  A moving party with the ultimate burden of proof must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.  Celotex, 477 U.S. at 331. In other words, the moving party must show that the evidence is so powerful that no reasonable jury would disbelieve it.  Id; see also Lawyer, 100 F.Supp.2d at 1008.  With these principles in mind, the court turns to an analysis of defendants' motion.

**VII.    FACTUAL BACKGROUND**

Based on the parties' pleadings, affidavits, deposition testimony, and admissions on file, the following facts are undisputed or, if disputed, yet plaintiff has properly presented facts supporting his version of the disputed facts, the disputed facts are presented in the light most favorable to the plaintiff.

Plaintiff worked for Sprint for 14 years, holding a variety of jobs on the local and long distance side of the company prior to 1998.  In August of 1998, plaintiff was hired to work at Sprint PCS as a project manager responsible for directory assistance and operator services.

3

Plaintiff reported directly to Rob Hammond between August, 1998 and October, 1998; when an additional layer of management was added, he began reporting to Doug Brems. After Brems left the group, Thorne again reported to Hammond until Bob Brown was hired to replace Brems. Brown remained Thorne's direct supervisor until Thorne's resignation in April of 2000.

Sprint has an anti-harassment/anti-discrimination policy in place. "The Sprint Principles of Business Conduct" and "Not Here! Not Ever!" are two Sprint publications describing the company's policies concerning sexual harassment, which include a procedure for reporting incidents of sexual harassment. Plaintiff received and read a copy of these when he started working at Sprint. Additionally, these employee handbooks were posted on the company's intranet.

Thorne alleges that Hammond began harassing him at the beginning of 1999. He contends that the following occurred during the course of his employment at Sprint PCS:

1.    On four or five occasions, Hammond made comments in staff meetings about Thorne's physique. Thorne Dep. at 31.

2.    On one occasion, Hammond came up behind Thorne and massaged his shoulders. Thorne Dep. at 120-21.

3.    Hammond rubbed his leg against Thorne's for a prolonged period on two different occasions where the men were the only individuals present. Thorne Dep. at 42-44.

4.    In October or November of 1999, Hammond entered plaintiff's office while he was seated at his desk next to his office-mate, Jarrod Nichols, and

4

rubbed his erect penis against plaintiff's shoulder for a couple of minutes.
Thorne Dep. at 136-40.

5.  Approximately two days later, Hammond returned to Thorne's office and
    threatened to fire him if he told anyone about the incident. Thorne Dep. at
    140-41.

6.  Hammond followed Thorne into the men's restroom on ten or more
    occasions and stared at him inappropriately while he was using the urinal.
    Thorne dep. at 196-97.

7.  As a result of the incidents in the bathroom, Thorne began using the
    restroom on a different floor to avoid Hammond. Thorne dep. at 196.

Thorne reported the incidents of harassment to his supervisor, Bob Brown, on January 6,
2000. At the time of this disclosure, Thorne requested that their conversation remain confidential.
Brown, unclear on how to handle the situation, conferred with Kim Klosak from Sprint's Human
Resources department several days later. At this time, the two scheduled a meeting to discuss the
specifics of the situation further. On or around February 14, 2000, Brown relayed Thorne's claims
of harassment in full to Klosak. John Yuzdepski, the vice president to whom plaintiff reported,
was notified of the complaint shortly thereafter, at which time he spoke to Hammond regarding the
allegations. See Yuzdepski Dep. at pp. 12, 35-36.

The day after she learned of the harassment claims, Klosak contacted plaintiff. Corporate
Security then conducted an investigation into the matter by interviewing plaintiff and several other
witnesses. After reviewing Corporate Security's investigation notes, Klosak and Yuzdepski
determined that there was no merit to plaintiff's allegations. Yuzdepski testified that Thorne's

sexual harassment complaint was not credible because "there was no corroborating evidence to support [the] allegation." See Yuzdepski Dep. at pp. 12.

Klosak and Yuzdepski informed plaintiff of their decision to close the issue on March 20, 2000. Upon learning of this, Thorne reported, for the first time, that Hammond had been periodically following him into the restroom and staring at him inappropriately, and that he felt he was being retaliated against. Klosak spoke with plaintiff to obtain more information soon after he made these accusations. Corporate Security contacted plaintiff regarding the allegations on May 12, 2000.

Prior to this period, in January of 2000, Sprint refused plaintiff an annual, discretionary bonus. Brown Dep. Ex. 98. Several months later, plaintiff was awarded a negative performance rating. Brown Dep., Ex. 100; see also supra, at n.9. Up until that point, under Sprint's previous review system, plaintiff had always received a "meets objectives" performance review. Additionally, Brown, plaintiff's direct supervisor, regarded Thorne as a "valuable employee," Brown Dep. at p.61-62; although he did note two areas in which plaintiff needed work. Thorne claims that the decision to give him a negative LINK review, and to deny him a Management Incentive Program ("MIP") bonus,[1] was in retaliation for his complaint of harassment against Hammond. The parties differ as to who made the decision to deny plaintiff the bonus. However, it is uncontested that the decision was made at some time in late January of 2000, approximately two weeks after Thorne contacted Brown concerning the sexual harassment. Brown Dep. Ex. 98.

---

[1]Sprint performance reviews are known as "LINK reviews," and rate employees on a scale of 1-5, with 1 being the highest rating, and 5 being the lowest. An MIP is a discretionary bonus dependant upon the company's performance, as well as the individual employee's performance. See Uncontroverted Facts 35-36.

For the majority of time between March 8, 2000, and April 20, 2000, plaintiff was on short-term disability leave. On April 10, 2000, Thorne accepted a job at Birch Telecom. The Birch Telecom job paid approximately $15,000 more annually than plaintiff's job with Sprint PCS. On April 20, 2000, plaintiff submitted his resignation letter to Sprint. Not knowing that he had already accepted alternate employment, Klosak contacted Thorne, asking him to reconsider his resignation and offering to find him another position at Sprint that would no longer require his reporting to Hammond. Plaintiff claims that he refused this offer because there was no guarantee that he would not have to work on the same floor as Hammond. Thereafter, plaintiff filed the current action, alleging hostile work environment, retaliation, negligent supervision and negligent training. Defendants now seek summary judgment on plaintiff's claims.

## IV.     ANALYSIS

### A.     Hostile Work Environment

#### 1.     Title VII and the Missouri Human Rights Act

Because the relevant provisions of the MHRA mirror Title VII and are construed in accordance with federal precedent, see Finley v. Empiregas, Inc., 975 F.2d 467, 473 (8th Cir. 1992); Midstate Oil Co. v. Missouri Comm'n on Human Rights, 679 S.W.2d 842, 845-46 (Mo. banc 1984), I will analyze plaintiff's Title VII and MHRA hostile work environment claims together.

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 200e-2(a)(1). It has been held that this

provision is not limited to "economic" or "tangible" discrimination, but instead "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," and thus covers more than "terms" and "conditions" in the narrow contractual sense. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (citations and internal quotation marks omitted). Thus, unwelcome sexual advances that create an offensive or hostile working environment violate Title VII. Id.

To prevail on a hostile work environment claim, Thorne must demonstrate: (1) membership in a protected class; (2) the occurrence of unwelcome harassment; (3) that the harassment was based on his sex; (4) that the harassment affected a term, condition, or privilege of his employment; and (5) that Sprint knew or should have known of the harassment, but failed to take appropriate remedial action. Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999) (citations omitted).

### 2. "Sexual" Conduct

Defendants first argue that plaintiff's sexual harassment claim should fail because he cannot establish that he was subject to conduct of a "sexual nature." Defendants contend that "isolated incidents such as the leg and shoulder touching are not 'sexual in nature' or the 'type that would interfere with a reasonable person's work performance . . . to the extent required by Title VII.'" Defendant's Suggestions in Support, p.15.

First and foremost, the Eighth Circuit has noted that the conduct supporting a hostile environment, sexual harassment claim need not be explicitly sexual in nature. See, e.g., Carter, 173 F.3d at 701 (citing Smith v. St. Louis Univ., 109 F.3d 1261, 1265 (8th Cir. 1997); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir. 1993)). Moreover, the cases cited by

8

defendants do not support their argument. In <u>Hopkins v. Baltimore Gas & Elec. Co.</u>, 77 F.3d 745 (4th Cir. 1996), the Fourth Circuit noted that the alleged conduct was "sexually neutral, or at most, ambiguous." <u>Id.</u> at 753. In affirming the district court's decision to grant defendant summary judgment, it pointed out that the plaintiff had not claimed that any overt sexual propositions or sexual touching had occurred. <u>Id.</u> Likewise, in <u>Pavao v. Ocean Ships, Inc.</u>, 1998 WL 917528, *2 (N. D. Cal., Dec. 30, 1998), the court held that the actions of plaintiff's supervisor in occasionally touching plaintiff on the arms, shoulders and neck amounted to incidental physical contact.

Conversely, Thorne contends that Hammond rubbed his erect penis against his shoulder for several minutes. Physical contact such as this is clearly sexual in nature.[2] Thorne has also asserted that Hammond rubbed his shoulders, inappropriately stared at him while he used the urinal and pressed his leg up against Thorne's in a private setting. This conduct, too, could reasonably be interpreted as sexual in nature.

### 3. *"Because Of"*

Same-sex harassment is actionable under Title VII to the extent it occurs "because of" the plaintiff's sex. 42 U.S.C. § 200e-2(a)(1); <u>Onacle v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75 (1998). Thus, Thorne may not prevail on his claim unless there is evidence from which the factfinder could infer that Hammond harassed him because he is a man. Defendant contends that plaintiff does not meet any one of the three evidentiary routes for proving same-sex gender based discrimination as suggested by the Supreme Court in <u>Onacle</u>, and that therefore, his Title VII claim should be dismissed.

---

[2]Defendants' argument that this was an "'isolated incident' which was not 'extremely severe'" goes to whether the conduct alleged was sufficiently severe and pervasive enough to create an objectively hostile or abusive work environment under Title VII, and not whether the conduct was "sexual." This issue will be addressed further below.

9

In Oracle, the Court identified three ways in which a showing of "discriminat[ion] . . . because of . . . sex" might be shown. First, plaintiff can prove that sexual desire motivated the harasser. 523 U.S. at 80. Second, an inference of discrimination can be drawn if a victim is harassed in such sex-specific and derogatory terms as to reveal an antipathy to persons of the victim's gender. Id. Lastly, proof that men and women were treated differently in the workplace will indicate that a plaintiff has been discriminated against because of his or her gender. Id.[3] With regard to the first theory, Justice Scalia, writing for the Court, remarked that an inference of discrimination is easy to draw in a "male-female sexual harassment situation[]" where "explicit or implicit proposals of sexual activity" have occurred because it is "reasonable to assume" that such a proposal would not have been made to someone of the same sex. Id. He then noted that the same inference would be available to a plaintiff alleging same-sex harassment "if there were credible evidence that the harasser was homosexual." Id. Defendants, in turn, have focused on this dicta, claiming that plaintiff cannot prove that sexual desire motivated Hammond without "credible evidence" that he is a homosexual.

I disagree with the conclusion that one cannot infer sexual desire for the victim on the part of the harasser absent independent proof of homosexuality. First, evidence that a sexual harasser is gay may be hard to come by. Unfortunately, many homosexuals take great care to hide their sexual orientation from those with whom they work for fear that disclosure may lead to humiliation or even physical harm. Moreover, what is "credible evidence" of an individual's sexual

_____

[3]There is nothing in the Supreme Court's decision which suggests that the three listed examples were meant to be exhaustive. See Shepherd v. Slater Steel Corp., 168 F.3d 998, 1009 (7th Cir. 1999). The Court's focus in Oracle was on what the plaintiff must ultimately prove rather than the on his methods of doing so. Id. Consequently, Thorne need only convince a factfinder that he was discriminated against "because of" his sex.

10

orientation? For instance, the fact that a man is married with children does not always mean that he is consistently heterosexual. The fact that a man is attracted to women, does not necessarily mean that he is not attracted to men as well. It would seem that the act of rubbing a man's shoulder with an erect penis would be "credible evidence" that a man is homosexual.[4]

Second, discrimination cases often depend on inferences rather than on direct evidence. Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)). Thus, summary judgment may not be the appropriate means for resolving an issue involving motive. See id.; Smith v. St. Louis Univ., 109 F.3d 1261, 1266 (8th Cir. 1997). While Oncale has made it clear that the sexual content of the alleged harassment will not automatically satisfy the "because of . . . sex" requirement, 523 U.S. at 80, it is possible that the sexual content of harassment can create an inference that the harassment is motivated by sexual desire. See Fry, 72 F.Supp. 2d at 1079. When a harasser makes advances that are of a sexual nature, one can "infer that the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers." Llampallas v. Mini-Circuits Lab, Inc., 163 F.3d 1236, 1246 (11th Cir. 1998) (quoting Fredette v. BFP Mgmt. Assocs., 112 F.3d 1503, 1505 (11th Cir. 1997)). The Supreme Court's reasoning in Oncale regarding the objective severity of the harassment applies with equal, if not more, force to inferences that must

---

[4]I note that a requirement that plaintiff "prove" that the harasser is homosexual leads to circuitous reasoning. According to defendants, only if the harasser is homosexual, is there an inference that plaintiff was harassed because of his gender. Yet, a male harasser's behavior towards his male victim may constitute "credible evidence that the harasser is homosexual." See, e.g., Fry v. Holmes Freight Lines, Inc., 72 F.Supp. 2d 1074, 1079 (W.D. Mo. 1999) (refusing to grant summary judgment to defendant on a same-sex sexual harassment claim because the conduct of the victim's male co-workers suggested that they might be oriented towards members of the same sex).

Case 4:00-cv-00913-HFS   Document 70   Filed 03/05/02   Page 11 of 28

be drawn regarding the "discrimination . . . because of . . . sex" requirement as well. According to the Court:

> In same-sex (as in all) harassment cases, the inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field – even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing and roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile and pervasive.

Onacle, 523 U.S. at 81-82. Here, plaintiff has contended that, among other things, defendants' employee "humped" his shoulder, threatened his job upon disclosure of this act, and followed him into the bathroom to stare at him while he urinated. A jury might draw the conclusion that Hammond is sexually attracted to Thorne, or it might conceivably draw the conclusion that he engaged in this type of behavior for a reason totally unrelated to sexual desire, or that the conduct did not occur. Whichever the case, it is not this court's role to find facts or construe inferences in favor of the moving party.

### 4.      Severe and Pervasive

As noted above, Title VII is violated when workplace harassment based on sex creates a hostile work environment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66-67 (1986). To be actionable, the sexual harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 67). In determining

12

whether an environment is sufficiently hostile or abusive to give rise to a Title VII violation, the court must consider all of the surrounding circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; the effect on the employee's psychological well-being; and whether it unreasonably interferes with an employee's work performance. Id. at 23. These factors should be evaluated both from subjective and objective perspectives. In other words, an environment that is sufficiently severe or pervasive is "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).

Defendants contend that plaintiff's allegations are not of the degree and intensity necessary to sustain a hostile work environment claim. However, I am convinced that the conduct alleged is sufficient to survive summary judgment. Contrary to defendants' belief, the severity and pervasiveness evaluation is "quintessentially a question of fact," and "particularly unsuited for summary judgment." O'Shea v. Yellow Tech. Services, Inc., 185 F.3d 1093, 1098 (10th Cir. 1999) (cited in Hocevar v. Purdue Frederick Co., 223 F.3d 721, 732 (8th Cir. 2000)). "Once there is evidence of improper conduct and subjective offense, the question whether the conduct rose to a persuasive level of abuse is largely one for the jury." Hocevar, 223 F.3d at 732; see also id. at 729 ("The ultimate determination as to whether the harassment was pervasive must be made by a jury."). For purposes of the summary judgment motion, on the present record the court accepts plaintiff's allegations concerning Hammond's conduct. Further, defendants have admitted that the conduct was subjectively unwelcome. See Defendants' Suggestions in Opposition, p.14. Consequently, all that is left to inquire into is whether a reasonable person would find that Hammond's conduct was hostile and abusive.

13

While it is true that sporadic and isolated incidents (unless extremely serious) will not generally give rise to a Title VII violation, that is not the case here. Defendants have repeatedly made reference to the "one incident . . . that can be deemed 'sexual,'" and contend that all other incidents consist of "innocuous touchings" and a complaint that was "not even made until Sprint's initial investigation had been completed."[5] Defendants' Suggestions in Opposition, p.21. As previously noted, I do not agree with the characterization of Hammond's conduct as nonsexual in nature. Moreover, I have a duty to review the totality of the circumstances and look at the conduct as a whole. "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'" Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) (quoting Burns v. McGregor Elec. Industries, 955 F.2d 559, 564 (8th Cir. 1992)).

There is a genuine issue of fact as to whether a reasonable person could find Thorne's work environment hostile and the conditions of his employment significantly altered; he was forced to start using the restroom on a different floor in order to avoid repetitive ogling by his supervisor, was subjected to intimate touching and rubbing on several occasions, endured comments about his physique in front of co-workers, was intimidated into keeping quiet about the incident in his cubicle, and experienced mental instability as a result of Hammond's conduct. Although this is not the most extreme case of harassment, lesser instances of abuse have survived summary judgment in this jurisdiction. See, e.g., Beard v. Flying J, Inc., 266 F.3d 792, 798 (8th Cir. 2001) (a reasonable person could find that work environment was sufficiently hostile where

---

[5]The fact that plaintiff delayed reporting the incidents in the restroom until after Sprint's initial investigation was completed is irrelevant for purposes of determining whether the alleged harassment was severe and pervasive.

14

plaintiff was subjected to several instances of unwanted sexual contact over a three-week period);

Hocevar, 223 F.3d at 729 (ongoing use of sexual vulgarity aimed at plaintiff as well as other

women meets the threshold proof of pervasiveness as a matter of law); Phillips v. Taco Bell

Corp., 156 F.3d 884, 888 (8th Cir. 1998) (whether inappropriate touchings on five occasions

created an objectively hostile working environment is best left to jury); Smith v. St. Louis Univ.,

109 F.3d 1261, 1264 (8th Cir. 1997) (frequent derogatory comments aimed at plaintiff because of

her gender were enough to allow a reasonable jury to conclude that the conditions of her

employment were altered); Ingram v. West, 70 F.Supp. 2d 1033, 1037 (genuine issue of fact

existed as to severity of harassment when plaintiff alleged that a door was slammed in her

proximity that made a picture fall off the wall, a window was left open overnight in her work area,

causing cold conditions the next day, and her ability as an employee was frequently ridiculed).

Consequently, I must abide by the premise that summary judgment is not an appropriate forum to

determine factual questions where a genuine issue of fact exists.

    **B.**    **Retaliation**

Thorne next argues that Sprint retaliated against him in response to his contacting

representatives of Sprint regarding Hammond's alleged sexual harassment.  To establish a prima

facie case of retaliation under Title VII, plaintiff must show that he engaged in protected activity,

that he suffered an adverse employment action, and that these events are causally related.  E.g.,

Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997).  Once the plaintiff has

established a prima facie case, the employer must articulate a legitimate, non-retaliatory reason for

the action complained of.  Id.  If the employer meets that burden, the plaintiff must then come

forward with sufficient evidence to permit an inference that the proffered reason is a pretext for retaliation. Id.

### 1. *Prima Facie Case*

There is no doubt that plaintiff engaged in protected activity when he lodged his harassment complaint against Hammond. Nonetheless, defendants believe that Thorne was not subject to an "adverse employment action." They further contend that plaintiff is unable to establish the final prong of a prima facie retaliation case – that there is a causal connection between Thorne's complaints of sexual harassment and the alleged adverse employment action.

I find that Thorne has successfully demonstrated an adverse employment action. In order to constitute an "adverse employment action," the action taken must have "a materially adverse impact" on plaintiff's terms or conditions of employment. Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1245 (8th Cir. 1998). In this case, Thorne claims that Sprint's decision to award him a negative performance rating and to deny him an MIP bonus constitute adverse employment actions. While a negative performance evaluation, without more, does not constitute an adverse employment action, see Cossette v. Minnesota Power & Light Co., 188 F.3d 964, 972 (8th Cir. 1999), this court has found that the denial of a bonus may. Burch v. Henderson, 2000 WL 97184, *13 (W.D. Mo. Jan. 27, 2000); see also Spears v. Missouri Tech., Inc., 210 F.3d 850 (8th Cir. 2000) ("An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.") (citations omitted)). Consequently, Sprint's decision to deny plaintiff an MIP bonus establishes the requisite adverse employment action for a claim of retaliation.[6]

_____

[6]A constructive discharge can constitute an adverse employment action as well. However, Thorne's constructive discharge claim will not be discussed in this context because, as indicated

16

I am also convinced that there are disputes of material fact regarding the causation element of plaintiff's claim. Sprint contends that Brown, plaintiff's direct supervisor, made the decision to withhold the MIP bonus. This fact is debatable,[7] but beside the point. Defendants claim that it is "impossible for a factfinder to link the complaint of harassment to the denial of the MIP" since "plaintiff does not believe that Brown retaliated against him." Defendants' Suggestions in Support, p.33. Counsel has failed to clarify the significance of this statement. I am aware of no case law holding that a claim for retaliation must fail if plaintiff mistakenly believes that the harasser is the one who carried out the adverse employment action. Assuming Brown, and not Hammond, made the ultimate decision regarding denial of the MIP, this fact, alone, does not nullify Sprint's liability if the decision was in fact retaliatory. Sprint, not Hammond, is the defendant in this case. Brown is clearly an agent of Sprint, and his actions would be imputed to the company.

Ironically, Sprint's claim that Brown made the decision to deny the bonus would hinder its case more than help it. Brown's knowledge of the complaint, along with the temporal proximity of the adverse employment action, is enough to overcome the obstacle of causation.[8] See Brower v.

_____

below, I find that plaintiff was not constructively discharged as a matter of law.

[7]From the materials submitted by the parties thus far, it is unclear whether Hammond, Brown or someone else carried out the adverse employment action. Sprint argues that Brown made the decision to give plaintiff a 4 on his LINK review, and that a scoring of a 4 or a 5 will automatically disqualify an employee for the MIP bonus. Under this scenario, it would seem that Brown made the ultimate decision to deny plaintiff the bonus. Nonetheless, plaintiff points out that the decision regarding his bonus was made in January of 2000, while changes to his LINK review were still being made as late as May 25, 2000. Thus, it would seem that Brown's rating of plaintiff on his LINK review had nothing to do with the decision to deny him the bonus.

[8]Thorne contends that knowledge by the supervisor who carried out the adverse employment action is not a prerequisite to a finding of retaliation. However, causation is generally lacking where no knowledge is present. See, e.g., Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 715 (8th Cir. 2000); Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998); Couch v. Sprint Corp., 131 F.3d 764, 765 (8th Cir. 1997); Simon v. Simmons Foods, Inc.,

Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999) ("An inference of retaliatory motive may be supported by evidence that the defendant was aware of protected activity and that the date of the adverse employment action closely followed such activity.") (citations omitted). Thorne approached Brown regarding his complaints of harassment on January 6, 2000, and the decision to deny the bonus was made approximately two weeks later. See Defendants' Suggestions in Support, p.32; Brown Dep. Ex. 98. Under this scenario, enough circumstantial evidence would exist to meet the third element of a prima facie case for retaliation.

### 2. *Evidence of Pretext*

As noted above, once the plaintiff has established a prima facie case for retaliation, the employer must articulate a legitimate, non-retaliatory reason for the action complained of. Montandon, 116 F.3d at 359. If the employer meets that burden, the plaintiff must then come forward with sufficient evidence to permit an inference that the proffered reason is a pretext for retaliation. Id. Here, Sprint cites evidence of Thorne's poor work performance as a legitimate, non-retaliatory justification for its actions. It has consistently maintained that Thorne's job performance resulted in a negative LINK review, which in turn, was the basis for the zero MIP payout. However, Thorne has presented evidence tending to show that his LINK review was never fully completed, and was not even written up until March 14, 2000.[9] Because defendants

_____

49 F.3d 386, 389 (8th Cir. 1995); Wolf v. Berkley, Inc., 938 F.2d 100, 103 (8th Cir. 1991).

[9]The completion of a LINK review requires the signature of both first and second level management. See Hammond Dep. at pp.35-37. In this case, Brown and Hammond were first and second level management. Id. Hammond has admitted that he never signed plaintiff's LINK review. Id. Moreover, there is evidence that Human Resources requested that Brown, plaintiff's supervisor responsible for completing his LINK, write up the review as late as March 14, 2000. See Brown Dep. Exhibit 100. Finally, Plaintiff's rating was changed from a 5 to a 4 on May 25, 2000. See Klosak Dep. at pp. 81-83.

18

have admitted that the decision to deny plaintiff the MIP bonus was made in January of 2000, at least a month and a half before his LINK review was composed, it is possible that Thorne's negative performance review may have been a contrived attempt to justify the denial of his MIP bonus. Consequently, a question of material fact exists as to whether Sprint's proffered reason for its denial of the bonus is pretextual. Plaintiff's claim for retaliation will not be dismissed on summary judgment.

### C.      Constructive Discharge

It is unclear whether plaintiff is claiming (1) that his constructive discharge was in retaliation for his allegations of sexual harassment, or (2) that defendants' retaliation resulted in his constructive discharge.[10] These are two separate arguments, which require different analyses. Under either scenario, I find that plaintiff was not constructively discharged as a matter of law.

To successfully state a claim for constructive discharge, Thorne must prove that Sprint intentionally created intolerable working conditions so that he was essentially forced to quit his job. Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494-95 (8th Cir. 1996). A plaintiff may satisfy the intent requirement by showing that his resignation was "a reasonably foreseeable consequence of the employer's discriminatory actions." Id. at 494 (citing Hukkanen v. Int'l Union of Operating Eng'rs, 3 F.3d 281, 285 (8th Cir. 1993). Furthermore, whether Thorne's working conditions were rendered "intolerable" is judged by an objective standard, not his subjective feelings. Id. at 494. Thus, constructive discharge arises only when a reasonable person in plaintiff's situation would find the conditions of employment intolerable. Moreover, an employee

---

[10]In his Amended Complaint, plaintiff contends that "[b]y reason of [his sexual harassment] complaints, defendants retaliated against plaintiff, resulting in the constructive discharge of plaintiff." First Amended Complaint, ¶¶ 53 and 71. However, this statement falls under Counts II and IV – plaintiff's Title VII and MHRA retaliation claims.

who quits without giving his employer a reasonable opportunity to correct the problem has not been constructively discharged. Id.

Thorne's theory that the retaliatory trauma he suffered was so severe as to result in his constructive discharge must fail. Thorne must demonstrate more than just a Title VII violation by Sprint in order to prove that he has been constructively discharged. See Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998) (rejecting plaintiff's claim for constructive discharge even though there was sufficient evidence to support the jury's finding of a retaliatory adverse employment action). He must show that his employer deliberately made his work environment so intolerable that resignation was his "only plausible alternative." Spears v. Missouri Dept. of Corrections & Human Resources, 210 F.3d 850, 854-55 (8th Cir. 2000) (citations omitted). In this case, plaintiff has alleged that defendants' conduct in assigning him a negative performance evaluation and denying him the MIP bonus was in retaliation for his complaints of sexual harassment. This may or may not be the case; however, such conduct does not create an intolerable working environment that is sufficiently severe for purposes of an independent constructive discharge claim. See, e.g., Tork v. St. Luke's Hosp., 181 F.3d 918, 919 (8th Cir. 1999) (holding that an unfavorable evaluation did not render conditions intolerable).

Likewise, the alternative theory – that Thorne's constructive discharge was the adverse employment action necessary to establish a prima facie case of retaliation – must also fail. While constructive discharge may amount to an "adverse employment action," Thorne has neglected to establish that he was, in fact, constructively discharged. To successfully state a claim for constructive discharge, Thorne must demonstrate that he did not quit without giving Sprint a reasonable opportunity to correct the problem. Thorne was notified by Human Resources on March 20, 2000, that his original allegations of harassment were found to be without merit. At this

20

time, Thorne reported that Hammond had followed him into the restroom on several occasions, and that he believed he was being retaliated against. A representative from Human Resources then contacted plaintiff about these complaints. Approximately one week later, on March 27, 2000, Thorne went on disability leave. Having received an offer of employment from Birch Telecom, which he accepted on April 10, 2000,[11] Thorne never returned to work at Sprint, and officially resigned on April 20, 2000.

Once plaintiff submitted his resignation, Sprint contacted him and requested that he reconsider his decision to leave the company. Further, it offered to transfer plaintiff within the company; thus, defendants attempted to correct the problem. Thorne, however, felt that Sprint's offer was inadequate in that he and Hammond would still be working on the same floor, and that no assurances could be given that he would not have contact with Hammond. Nonetheless, Thorne had an obligation not to jump to the conclusion that the attempt would not work, nor did he have the right to dictate how Sprint should try to solve the problem. See Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998).

There is also no evidence that Sprint intended to force Thorne to quit, or that it was reasonably foreseeable that he would. In fact, the evidence points the other way. Once Sprint became aware of Hammond's alleged conduct, it took steps to investigate plaintiff's sexual harassment complaints. When it learned of additional complaints, it investigated further. When Thorne submitted his resignation, Sprint attempted to take action that would prevent his

_____

[11]It is noteworthy that Birch Telecom's offer of employment paid close to $15,000 more a year than plaintiff was making at Sprint. Moreover, the offer was made on March 31, 2000. Thus, Thorne delayed accepting the job at Birch Telecom, which had a significantly higher salary, for some time. Such evidence indicates that perhaps plaintiff did not feel like resignation from Sprint was the only plausible alternative.

resignation. There is simply not enough evidence to support a finding that defendants' conduct created the compulsion to resign that is necessary for a successful constructive discharge claim.

### D. Negligent Supervision and Negligent Training

Thorne's response to the pending motion for summary judgment does not address defendants' contention that his complaints of negligent supervision and training are unsupported. Consequently, I am uncertain as to whether plaintiff means to abandon Counts V and VI. In any event, I find that there is no evidence upon which a reasonable fact finder could hold for Thorne on these conclusory claims.

### E. Punitive Damages

An employee seeking punitive damages from an employer in a hostile work environment action premised under Title VII must show that the employer acted with actual malice or deliberate indifference to his federally protected rights. Henderson v. Simmons Foods, Inc., 217 F.3d 612, 618 (8th Cir. 2000) (citing Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996), cert. denied, 519 U.S. 1110 (1997); 42 U.S.C. § 1981a(b)(1)). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Ass'n, 527 U.S. 526, 535 (1999). Under § 1981a, "an employer must at least discriminate in the face of perceived risk that its actions will violate federal law." Id. at 536. An employer would not have the requisite state of mind if it was "unaware of the relevant federal prohibition," or acted "with the distinct belief that its discrimination was lawful." Id. at 537.

Further, if the plaintiff demonstrates malice or reckless indifference, he must still prove that liability for punitive damages should be imputed to the employer. See id. at 539. In order for

Case 4:00-cv-00913-HFS   Document 70   Filed 03/05/02   Page 22 of 28

punitive damages to be assessed against an employer, the plaintiff must show that "an employee serving in a managerial capacity committed the wrong while acting in the scope of employment." Id. at 543 (citations omitted). However, an employer may escape vicarious liability for punitive damages if the discriminatory actions of managerial agents were contrary to the employer's "good faith efforts to comply with Title VII." Id. at 545 (citations omitted).

Defendants maintain that Sprint did not act with malice or reckless disregard of plaintiff's rights. See Defendants' Suggestions in Support, p.39. The gist of their argument relies on the fact that "Sprint had multiple policies in place explaining both its policy against sexual harassment and the avenues pursuant to which an employee could report harassment," and that Sprint conducted a "detailed investigation into plaintiff's claims of harassment." Id. at 40-41. Defendants' course of reasoning, however, appears to misinterpret the relevant inquiry. As noted above, "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law. Id. at 535. This element is satisfied by evidence that Hammond knew he was acting in violation of federal law when he sexually harassed plaintiff.[12] Only at this point does the

_____

[12]See, e.g., Kolstad, 527 U.S. at 539 (noting that liability for punitive damages must be imputed to the employer after a showing of "'malice' or 'reckless indifference' *on the part of certain individuals*" has been demonstrated) (emphasis added); Ogden v. Wax Works, Inc., 214 F.3d 999, 1010 (8th Cir. 2000) (finding sufficient evidence to support a punitive damages award where manager who harassed employee had knowledge of Title VII's prohibitions); Zimmermann v. Assoc. First Capital Corp., 251 F.3d 376, 384-86 (2d Cir. 2001) (upholding jury award of punitive damages because evidence suggested manager knew of corporation's anti-discrimination policies); Bruso v. United Airlines, Inc., 239 F.3d 848, 858 (7th Cir. 2001) ("A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws."); Romano v. U-Haul Int., 233 F.3d 655, 669 (1st Cir. 2000) (same); Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 447 (4th Cir. 2000) (upholding an award of punitive damages where there was evidence that the acting employee had knowledge of the federal law in question); EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999) (finding sufficient evidentiary basis for punitive damages where manager was familiar with prohibitions against discrimination); Bishop v. Bell Atlantic Corp., 143 F.Supp.2d 59, 67 (D.Me. 2001) (declining to remit punitive damages award

23

question of Sprint's vicarious liability, and hence, its good faith attempt to comply with Title VII, come into play. Defendants themselves have pointed to the wide circulation of Sprint's anti-discrimination policy. This, in turn, is evidence that Hammond was aware that his actions were in violation of federal law.[13] Consequently, the requisite state of mind appears to be present.

The inquiry, however, does not end with a showing of "'malice' . . . or 'reckless indifference' on the part of certain individuals." Id. at 539. Thorne must impute liability for punitive damages to Sprint. In Klostad, the Court noted that punitive damages can properly be awarded against a master or other principle due to the conduct of an agent if the agent was employed in a managerial capacity and was acting in the scope of employment. Defendants have taken no stance as to whether Hammond was or was not employed by Sprint in a managerial capacity. Their argument, instead, focuses on the fact that Sprint had policies denouncing sexual harassment, and avenues by which an employee could report harassment. In other words, they are attempting to argue that liability for punitive damages should not be imputed to Sprint because the alleged discriminatory actions of Hammond were contrary to its good faith effort to comply with Title VII.

As an initial matter, it is necessary to determine who bears the burden of proving or disproving good faith compliance with Title VII. Although the Eighth Circuit has not directly addressed this question, it has characterized good faith compliance as "an exception" to vicarious

_____

because managerial staff testified that they knew retaliatory discrimination was illegal).

[13]Sprint's publication on sexual harassment, "Not Here! Not Ever!," states that sexual harassment is illegal, notes that the Equal Employment Opportunity Commission is a federal agency charged with enforcing laws concerning sexual harassment, and makes reference to the United States Supreme Court's stance on sexual harassment in the workplace. See Defendants' Ex. O, at pp. 2, 7.

liability for punitive damages. E.g., Ogden v. Wax Works, Inc., 214 F.3d 999, 1009 (8th Cir. 2000) (quoting Kolstad, 527 U.S. at 524; see also, Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 445 (4th Cir. 2000). Likewise, the Second, Fifth and Ninth Circuits have labeled good faith compliance as "an affirmative defense" to vicarious liability for punitive damages. Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001); Passantino v. Johnson & Johnson Consumer Products, Inc., 212 F.3d 493, 516 (9th Cir. 2000); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 286 (5th Cir. 1999). Finally, the First and Seventh Circuits have held that the employer is responsible for demonstrating good faith efforts to comply with Title VII. Romano v. U-Haul Int'l, 233 F.3d 655, 670 (1st Cir. 2000); Cooke v. Stefani Mgmt. Servs., Inc., 2001 WL 503600 (7th Cir.2001). Based on these cases, I find that defendants bear the burden of proving good faith compliance with Title VII as a means to avoid vicarious liability for punitive damages. Consequently, their evidentiary burden is higher than would normally be the case in a motion for summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986); Lawyer v. Hartford Life & Accident Ins. Co., 100 F.Supp.2d 1001, 1008 (W.D. Mo. 2000). Sprint must show that its evidence satisfies the burden of persuasion *and* that the evidence is so powerful that no reasonable jury would disbelieve it. Celotex, 477 U.S. at 331; see also Lawyer, 100 F.Supp.2d at 1008.

To demonstrate good faith under Title VII, Sprint relies on the existence of its employee handbooks, which set forth Sprint's "Principles of Business Conduct" and encourages employees to promptly report any sexual discrimination or harassment to their supervisor, another member of management, or the Human Resources department. See Defendants' Ex. N, p.18; Ex. O, p. 8-11. Further, Corporate Security conducted an investigation into plaintiff's allegations, and Klosak, from Human Resources, and Yuzdepski, the vice-president to whom plaintiff reported, determined

that the issue was to be closed because there was "no corroborating evidence" to support plaintiff's allegations. Nonetheless, I cannot conclude at this stage in the proceedings that Sprint has established a good faith effort to comply with Title VII as a matter of law. Whether a punitive damage submission occurs at trial remains to be seen. The parties will be entitled to an evaluation based on the trial evidence.

First, the mere existence of an anti-discrimination policy will not automatically satisfy the good-faith requirement if an employer is not committed to enforcing the policy. See, e.g., Ogden, 214 F.3d at 1010. There are several factors that undermine Sprint's contention that it undertook good faith efforts to comply with Title VII. Brown's admission that he did not know whether to report plaintiff's complaint of harassment, regardless of the fact that plaintiff requested his silence on the issue, is some evidence that management employees were not well-trained in the Sprint sexual harassment policy. So too, is the fact that Brown requested Thorne's presence with him and Hammond on an overnight business trip the day after plaintiff told Brown of the harassing incidents involving Hammond. See Uncontroverted Fact 129; see also Henderson v. Simmons Food, Inc., 217 F.3d 612, 619 (8th Cir. 2000) (pointing to the employer's decision to place plaintiff in close proximity to the harasser as one factor tending to show that the employer acted in deliberate indifference to plaintiff's federally protected rights). Finally, Yuzdepski informed Hammond of plaintiff's allegations sometime in mid-February. See Yuzdepski Dep. at pp. 12, 35-36. Telling the alleged harasser the identity of the complainant would surely serve to discourage employees from reporting illegal behavior, not encourage it. See Madison v. IBP, Inc., 257 F.3d 780, 796 (8th Cir. 2001). Taken in conjunction with defendants' altered summary judgment burden, the evidence, viewed in the light most favorable to Thorne, may justify submitting the punitive damages claim under Title VII to the jury.

Defendants also contend that plaintiff's punitive damages claim under the MHRA should be dismissed. In support, they note that, in order to receive punitive damages under the MHRA, Thorne must show "actual outrageousness, that is, a 'culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences.'" Defendants' Suggestions in Support, p.40 (quoting Hunley v. Sprint United Management Co., 2001 WL 1327079 at *1-2 (8th Cir. 2001) (internal citations omitted)). They then make the conclusory statement that the existence of an anti-discrimination policy renders punitive damages unrecoverable under the MHRA, yet cite no case law which supports this proposition. Defendants do not allege that the rule for punitive damages under the MHRA should or should not be construed in accordance with federal precedent under Title VII, and have shed no light on the meaning of the phrase "wanton, willful or outrageous act, or reckless disregard . . . for an act's consequences."[14] Accordingly, summary judgment on plaintiff's claim for punitive damages under the MHRA will also be denied.


**V.      CONCLUSION**

Based on the foregoing discussion, it is hereby ORDERED that Defendants' Motion for Summary Judgment (ECF doc. 55) is GRANTED to the extent that it seeks to dismiss plaintiff's claims for constructive discharge, negligent training and negligent supervision. Defendants' motion is otherwise DENIED. This case remains on the 2002 Spring Accelerated Docket.

----

[14]A casual disregard of a complaint because there are two conflicting stories may be offensive to the fact finder, if, for example, it is obvious that Hammond is not being truthful.

Case 4:00-cv-00913-HFS   Document 70   Filed 03/05/02   Page 27 of 28

/s/Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

March 5, 2002

Kansas City, Missouri