# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

Michael Thorne,       )
              )
    Plaintiff,      )
              )
v.            )   Case 00-0913-HFS
              )
Sprint/United Management, et al.  )
              )
    Defendants.    )

## PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, AND REMITTITUR

COMES NOW Plaintiff, by and through his attorneys of record, and for his suggestions in opposition to defendants' motion for judgment as a matter of law, new trial, and remittitur, shows the Court the Following:

## I.  JAML IS NOT WARRANTED ON PLAINTIFF'S RETALIATION CLAIM

### Standard for JAML

The law places a high standard on overturning a jury verdict." *Hathaway v. Runyon,* 132 F.3d 1214, 1220 (8th Cir.1997). "Because the law places a high standard on overturning a jury verdict, JAML is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party." *Blackmon v. Pinkerton Sec. & Investigative Serv.,* 182 F.3d 629, 635 (8th Cir.1999).  Judgment as a matter of law "is in order only where the evidence points all one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Meisner v. United States,* 133 F.3d 654, 656 (8th Cir.1998). The court must determine if sufficient evidence exists to support the verdict

returned by the jury. *Cowan v. Strafford R-VI School Dist.,* 140 F.3d 1153, 1157 (8th Cir.1998). All evidence must be viewed in the light most favorable to the verdict. *Id.* "This means that the court must assume as proven all facts that the nonmoving party's evidence tended to show, give the nonmovant the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in the nonmovant's favor." *Cross v. Cleaver,* 142 F.3d 1059, 1066 (8th Cir.1998). The court cannot "engage in a 'weighing or evaluation of the evidence or consider questions of credibility.' " *Cowan*, 140 F.3d at 1157 (quoting *White v. Pence,* 961 F.2d 776, 779 (8th Cir.1992)). The court simply asks whether "sufficient evidence was produced to support a reasonable finding on each of the elements of the plaintiff's claim or claims." *Cross*, 142 F.3d at 1066. Plaintiff respectfully points out that in the innumerable cases defendant cites in its brief excerpting "holdings" in piecemeal fashion deal largely with summary judgment rulings and are therefore of little significance to the Court in a decision to overturn a unanimous verdict of eight. What the defendants ask this Court to do is precisely what it should not do, engage in a weighing or evaluation of the evidence or consider questions of credibility.

**A.  Plaintiff Adduced Sufficient Facts for Submission to the Jury of a Retaliation Claim**

**1.  Plaintiff Established a Prima Facie Claim of Retaliation**

To establish a prima facie case of retaliation, a plaintiff must show that he engaged in statutorily protected activity, that the defendant took adverse action against him, and a connection between the two.  *Montandon v. Farmland Indus., Inc.,* 116 F.3d 355, 359 (8th Cir.1997).   The defendant may then rebut the plaintiff's case by advancing a legitimate, nonretaliatory reason for the adverse employment action.  *Id.*  If the

defendant makes this showing, the plaintiff must show that the defendant's proffered reason was a pretext for illegal discrimination. *Id.* As this Court in *Burch v. Henderson,* 2000 WL 97184 (W.D.Mo.2000) concluded, the withholding of a bonus may constitute an adverse employment action for purposes of retaliation analysis.

## 2. Plaintiff Demonstrated Causation Between The Complaints and Denial of MIP

On January 6, 2000 plaintiff advised Bob Brown of misconduct by Robert Hammond. On January 10, 2000, a meeting was held between Bob Brown and Kim Klosak to discuss this matter and, at this time, Brown admitted it was his duty, per defendants' policy, to report the incident and the names of the individuals involved. Shortly thereafter, a meeting was held in Orlando, Florida and Mr. Thorne's bonus was discussed among Brown, Hammond, and Yuzdepski. At this time, Brown told "anybody that would listen" that he wanted Thorne to receive a bonus. On January 23, 2000, Robert Hammond withheld a bonus for plaintiff. On February 14, 2000, Brown met again with Human Resources. A corrective action memo dated February 16, 2000 alleging Thorne's performance deficiencies was created by Brown. On February 28, 2000, Hammond entered a 5 LINK rating for Thorne.

John Yuzdepski testified that he told Hammond of the allegations either in January, February, or March. His testimony was that he could not recall if he discussed the allegations in January, February 14, 2000, or February 28, 2000 but that it was shortly after Human Resources was advised and before Mr. Hammond was interviewed by corporate security on March 3, 2000. Regardless, the evidence at trial was sufficient for the jury to conclude that Hammond knew of the allegations when Thorne's rating was devised. They could simply believe that Brown followed policy and told Klosak of the

incidents on January 10, 2000 and all the actors names were divulged, as policy would require.

### 3. Plaintiff adduced sufficient facts demonstrating the proffered reasons for the denial of his MIP were pretextual

Brown admitted that plaintiff was a valuable employee and that he did not want to lose plaintiff to another group. He testified, in response to questioning by the Court, that all the e-mails which defendants painstakingly used to support their argument that plaintiff was a terrible employee, were not significant. He admitted that on a timeline prepared after plaintiff's resignation, there was no mention of any of plaintiff's alleged performance deficiencies. He testified that he never corrected plaintiff regarding his alleged "unprofessional" behavior. Brown also admitted that he would have provided plaintiff a favorable recommendation for any job transfer plaintiff was qualified. No witness disputed that plaintiff's product became profitable.

In *Yates v. Rexton, Inc.*, 267 F.3d 793, 800, 01 (8th Cir.2001) the Court found the fact that plaintiff did not receive his periodic review and had increased bottom line important in finding defendant's poor review pretext:

> Although Rexton argues that Yates's performance was unsatisfactory, Yates presented evidence to the contrary. Rexton's policy calls for employees to receive periodic performance reviews, but Yates received no such reviews during his employment…Rexton's bottom line grew during Yates's tenure, as well. Rexton's sales grew an average of 30 percent a year for each of the five years prior to Yates's termination.

Like the plaintiff in Yates, plaintiff's product grew during the time in which his performance was said to be lacking. There was no dispute at trial that the product plaintiff oversaw, grew at an amazing pace. Moreover, Mr. Thorne had always received positive reviews. These reasons alone are sufficient to establish that the denial of the MIP were pretext.

## II. JAML IS NOT WARRANTED ON PLAINTIFF'S PUNITIVE DAMAGE CLAIM

Here again, the Court is asked by defendant to engage in weighing and evaluating the evidence and consider questions of credibility of witnesses. In order to submit instructions for punitive damages, a plaintiff need only demonstrate that the defendant had the "requisite state of mind" of malice or reckless indifference. *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1008 (8th Cir.2000). The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118. In *Kolstad,* the Supreme Court delineated specific situations in which, despite the employer's discrimination, the application of punitive damages is inappropriate: (1) the employer is unaware of the relevant federal prohibition; (2) the employer discriminates in the belief that the discrimination is lawful; (3) the underlying theory of discrimination may be novel or poorly recognized; or (4) the "employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense." *Id.* at 536-37, 119 S.Ct. 2118. Defendant cannot avail itself of these exceptions.

The employer need not be aware that it is engaging in discrimination. Instead, it need only act "in the face of a perceived risk that its actions will violate federal law." *Id.* at 536, 119 S.Ct. 2118. A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws and the employer's policies for implementing those laws. Clearly, the defendants' employees

were aware of the laws prohibiting retaliation. A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir.2000) (stating that the jury could have concluded that the defendants did not reasonably believe their conduct was lawful because they lied to the plaintiff and at trial in order to conceal their discriminatory actions against her); *EEOC v. Wal-Mart Stores, Inc.,*156 F3d 989, 993-994 (9th Cir.1998) ('[T]he evidence regarding the attempts by Wal- Mart managers to cover up their discriminatory conduct supports the EEOC's claim of reckless indifference to [a pregnant applicant's] federally protected rights. ... [T]he EEOC presented evidence that supports a finding that Wal-Mart, in order to cover up the discrimination, fabricated the applicant's face-to-face interview with [an assistant manager], during which she allegedly expressed her concerns about her pregnancy and her ability to perform the layaway job.'); *Baty v. Willamette Industries, Inc.,* 172 F.3d 1232, 1245 (10th Cir.1999) (punitive damages in part justified by employer's patently false reasons for discharge); *Hardin v. Caterpillar, Inc.,* 227 F3d 268, 270- 271 (5th Cir.2000) ('[A] reasonable juror could conclude that the [employer's] representatives were either lying or consciously indifferent to the truth and the legality of their acts.').

The EEOC's Enforcement Guidelines provide that evidence that an employer's agents "planned and/or attempted to conceal or cover-up the discriminatory practices or conduct" can support a finding that the employer acted "with malice or reckless indifference to the complaining party's federally protected rights." *EEOC Enforcement*

*Guidance: Compensatory and Punitive Damages Available under § 102 of the Civil Rights Act of 1991*, *reprinted in* Fair Employment Practices Manual (BNA) 405:7091, at 7107 (July 7, 1992).

Clearly, the jury in this case did not believe the witnesses of defendant. Many of defendants' employees contradicted themselves and each other as to dates and times of significance. For instance, defendants' employees contradicted one another as to when individuals met to discuss Mr. Thorne's allegations of harassment. Bob Brown said he met with Kim Klosak on January 10, 2000. Ms. Klosak testified that she did not meet with Bob Brown regarding any allegations until February 14, 2000. Bob Brown testified he wanted plaintiff to receive a 4 rating, Rob Hammond testified that Brown rated plaintiff a 5. John Yuzdepski testified that as a result of discussions in Orlando, plaintiff was to get a 75% on his MIP. After a break, his testimony changed and he testified plaintiff was supposed to receive 25% which then defaulted to a zero payout.

Even the Court had reservations about whether "lies" could sustain a punitive damage award in a memorandum to counsel shortly after the verdict. Clearly, however, if the jury believed that the defendants' employees that contradicted one another were untruthful or lied to them or the plaintiff, punitive damages may be warranted.

## II. A NEW TRIAL IS NOT WARRANTED

To justify a new trial, a court must find the result, if allowed to stand, would be a "miscarriage of justice." *White v. Pence,* 961 F.2d 776, 780 (8th Cir.1992). A new trial may be necessary because of trial error, verdicts against the weight of the evidence, or damage awards that are excessive or inadequate. *Gray v. Bicknell,* 86 F.3d 1472, 1480 (8th Cir.1996). Regardless of the cause, for a court to grant a new trial the jury's verdict

must go against the "great, clear, or overwhelming weight of the evidence." *White* at 780-82.

When deciding whether to grant a new trial, the district court is not allowed to "usurp the functions of the jury" or "set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because the judge[ ] feel[s] that other results are more reasonable." *White,* 961 F.2d at 780. For the following reasons, a new trial is not warranted.

### 1. The Court Properly Excluded Kolstad Language From the Punitive Damage Instruction

When an instructional error has been properly preserved for appeal, appellate courts review for abuse of discretion and "must determine simply 'whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury.' " *Kim v. Nash,* 123 F.3d 1046, 1057 (8th Cir. 1997) (quoting *Karcher v. Emerson Elec. Co.,* 94 F.3d 502, 510 (8th Cir .1996), *cert. denied,* 520 U.S. 1210, 117 S.Ct. 1692, 1693, 137 L.Ed.2d 820 (1997)). As the following shows, the Court properly submitted the case to the jury without *Kolstad* language.

For purposes of determining liability for acts of its agents with regard to punitive damages, the *Kolstad* Court adopted the Restatement (Second) of Agency § 217C, which, "contemplates liability for punitive awards where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.' " *Kolstad* at 2126 (citing Restatement (Second) of Agency, § 217C)). Allowing that "no good definition of what constitutes a 'managerial capacity' has been found[,]" the Court suggested a "factual inquiry" focusing upon "the type of authority that the employer has

given to the employee, [and] the amount of discretion that the employee has in what is done and how it is accomplished." *Id.* at 2128-29 (citing Restatement (Second) of Torts, § 909). The Court interpreted the "scope of employment" requirement broadly: "[I]ntentional torts are within the scope of an agent's employment if the conduct is 'the kind [the employee] is employed to perform,' 'occurs substantially within the authorized time and space limits,' and 'is actuated, at least in part, by a purpose to serve the' employer. [S]o long as these rules are satisfied, an employee may be said to act within the scope of employment even if the employee engages in acts 'specifically forbidden' by the employer and uses 'forbidden means of accomplishing results.' " *Id.* (citing Restatement (Second) of Agency, §§ 228, 230).

The Court stated that if those decisions are contrary to the employer's "good faith efforts to comply with Title VII" liability may not be imputed to the employer. *See Kolstad,* 119 S.Ct. at 2129. The Court left to lower courts the determination of what measures constitute "good faith efforts," stating only that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms[,]" and "[t]he purposes underlying Title VII are similarly advanced where employers are encouraged to adopt anti-discrimination policies and to educate their personnel on Title VII's prohibitions." *Kolstad,* 119 S.Ct. at 2129.

The defendants have never stated that Hammond or any other individual that participated in the actions against plaintiff were not managerial. Instead, they have relied on the "good faith" exception. Defendants concede, in accordance with the *Kolstad* opinion, that the trial court determines "good faith." Moreover, it is the defendant that has the burden of persuasion on the issue of "good faith." See *Romano v. U-Haul*

*International*, 253 F3d 655, 670 (1st Cir.2000) ('The defendant is responsible for showing good faith efforts to comply with the requirements of Title VII.'). Simply put, the trial court, after hearing the evidence, did not believe "good faith" had been established and appropriately determined that the instruction was reflective of the evidence.

Moreover, simply because defendant has a written policy does not insulate it from punitive damages. See *Bruso v. United Airlines, Inc*., 239 F3d 848, 858 (7th Cir.2001) ('Every court to have addressed this issue thus far has concluded that, although the implementation of a written or formal anti-discrimination policy is relevant to evaluating an employer's good faith effort at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award.'); *Cadena v. Pacesetter Corp*., 224 F3d 1203, 1210 (10th Cir.2000) ('[E]ven if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware.').

*Kolstad* did not address the availability of such a defense when dealing with evidence of *direct liability* and not vicarious liability. Since *Kolstad,* one Court has addressed whether such defense is available when there is evidence of direct liability. *Deters v. Equifax Credit Information Services, Inc.,* 202 F.3d 1262 (10th Cir. 2000).

In *Deters*, the Tenth Circuit concluded that when there is evidence of direct liability, the affirmative defense of "good faith" under *Kolstad* cannot be raised as a matter of law. *Id.* at 1271. "[K]olstad was a case involving vicarious liability, unlike this case that is premised on a theory of direct liability. Thus, the good-faith defense does not

apply." *Id.* "[An] employer's malice or reckless indifference in failing to remedy or prevent a hostile or offensive work environment of which management level employees knew or should have known is premised on direct liability, not derivative liability, according to the doctrine of respondent superior." *Id.* at 1270. As the Court further stated:

> vicarious liability applies to situations in which a supervisor perpetrates harassment himself, whereas a theory of direct liability is more appropriate where an employer fails to respond adequately to harassment of which a management-level employee knew or should have known. This distinction is subtle, but proves to be crucial to our discussion of Equifax's invocation of a "good-faith" defense.

In the case at hand, defendants' were not merely negligent. They actively campaigned against plaintiff at the highest levels of human resources and their legal department to cover the original 5 rating entered by Hammond. Bob Brown was instructed as to how to create plaintiff's evaluation in using certain language and verbiage. This case involves direct liability. All levels of the company, from management to Human Resources to Sprint's legal division, were involved in the acts undertaken against plaintiff after his complaint was made.

As previously stated, when proof of direct liability exists, the defendant is not allowed to assert the "good faith" defense for punitive damages as allowed under *Kolstad*. This only makes sense. *Kolstad*'s "good faith" defense to vicarious liability exists to protect the company from a rogue manager where the company has no knowledge of his or her conduct. Where the defendant employer has knowledge of the conduct, this affirmative defense to punitive damages is not allowed. *Id.*

**B. The Jury's Verdict is Not Excessive**

**1. The Compensatory Award was Not Excessive**

"Compensatory 'damages for emotional distress must be supported by competent evidence of "genuine injury." ' " *Foster v. Time Warner Entm't Co.,* 250 F.3d 1189, 1196 (8th Cir.2001) (quoting *Forshee v. Waterloo Indus., Inc.,* 178 F.3d 527, 531 (8th Cir.1999)). To prove emotional distress in relation to his retaliation claim, plaintiff was not required to present medical or other expert evidence. *See Kim v. Nash Finch Co.,* 123 F.3d 1046, 1065 (8th Cir.1997). Instead, "[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in this regard." *Hammond v. Northland Counseling Ctr., Inc.,* 218 F.3d 886, 893 (8th Cir.2000)

As the Eighth Circuit recently held in *Webner v. Titan Distribution, Inc.,* 267 F.3d 828 (8th Cir.2001) on the issue of emotional distress awards:

> **"[a]wards for pain and suffering are highly subjective and the assessment of damages is within the sound discretion of the jury, especially when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms."** (emphasis added) (internal citations and quotations omitted)  See also; *Jenkins v. McLean Hotels, Inc.,* 859 F.2d 598, 600 (8th Cir.1988) *Morrissey v. Welsh Co.,* 821 F.2d 1294, 1299 n. 3 (8th Cir.1987); *Stafford v. Neurological Medicine, Inc.,* 811 F.2d 470, 475 (8th Cir.1987); *Vanskike v. Union Pac. R .R.,* 725 F.2d 1146, 1150 (8th Cir.1984).

Larger compensatory awards have been seen in this circuit and others.  In *Thorne v. Welk Inv., Inc.*, 197 F.3d 1205 (8th Cir.1999) the Court concluded $135,000 in compensatory damages was not excessive in light of psychological treatment and the fact that plaintiff was off work ill for two weeks due to sexual harassment despite the fact that plaintiff was re-employed within weeks.  See also *O'Rourke v. Providence*, 235 F3d 713, 733- 734 (1st Cir.2000) ($275,000 when 'difficulty sleeping and gained weight;' 'distress became so severe she was eventually unable to function;' diagnosed with post- traumatic stress disorder that lasted at least two years); *Dodoo v. Seagate Technology, Inc.*, 235 F3d

522, 532 (10th Cir.2000) ($125,000 when 'trouble sleeping and wakes up with his heart pounding, not knowing where he is,' too old to start a new career, lowered self- esteem, and 'sought the counsel of his wife, ministers, and friends').

Defendant states that the "only 'evidence' that plaintiff presented regarding his emotional distress from being denied less than $3,000 was his own testimony and that of Dr. Meninger and Dr. Logan."  Such a statement begs the questions as to what other evidence a plaintiff need provide to the Court and jury.  Mr. Thorne presented expert testimony from his own physician and that of defendants' expert showing that Mr. Thorne has suffered extreme emotional distress resulting from both the harassment and retaliation at Sprint.  Mr. Thorne presented evidence that his condition required medication and over fifty visits to a physician.  Mr. Thorne was placed on short term disability on two occasions because of the incidents at Sprint.  Defendants' expert conceded that Dr. Meninger had conducted appropriate therapy and agreed with all aspects of treatment and diagnosis but for the PTSD.  Mr. Thorne testified regarding his suicidal ideations and problems with his children as a result of the occurrences at Sprint. This point should be denied. The jury has spoken. This award should not be reversed or remitted merely because it is larger than the Defendants anticipated and their own physician was perhaps a better witness for plaintiff than defendants.

### 2.  The punitive Damage Award did not Violate Sprint's Due Process Rights

The jury awarded compensatory damages of $102,850.00 and $1.1 million in punitive damages.  *BMW of North America v. Gore*, 517 U.S.559, 116 S.Ct. 1589 (1996), is clearly distinguishable from the case at hand. The problem in *BMW* was the ratio of actual damages to punitive damages. With only $4,000.00 in actual damages and

$2,000,000.00 in punitive damages the Court was justifiably concerned with a ratio of 500 to 1.

In the present case the actual to punitive damage ratio is a very conservative 9 to 1. The four factors enumerated in the BMW case are also distinguishable. This is not a case about a damaged vehicle.  Mr. Thorne was subjected to retaliation. This jury clearly sent Sprint the only message it could send.

In *BMW*, the Supreme Court held that the following factors should be considered to determine whether a punitive damages award is so grossly excessive as to violate federal due process rights: (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm suffered by the plaintiff and the punitive damage award, and (3) the civil penalties that may be imposed in comparable cases. 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) An examination of these factors demonstrates that the $1.1 million award of punitive damages does not violate defendants' due process rights.

**The Degree of Reprehensibility of Sprint's Conduct.**

The Defendant's argument concerning reprehensibility is a misstatement of the evidence offered by the plaintiff.  Defendants suggest that its actions do not even hint at reprehensible conduct. The jury certainly felt otherwise.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id*. The degree of reprehensibility of the defendant's conduct in this case mandates that the punitive damage award should stand.  The *BMW* Court suggested a hierarchy of reprehensibility, with acts of violence or threats of bodily harm the most reprehensible,

followed in order by acts in reckless disregard for others' health or safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence. *Gore* at 1598-1602. Defendants' tort includes the affirmative act of retaliating against a 14 year employee who did nothing but report wrongdoing by a supervisor. As a result of this reporting, plaintiff's evaluations were arguably contrived to attempt to demonstrate that plaintiff was a poor employee and that his complaints were the result solely of eschewing responsibility for poor performance. Obviously, defendants' employees understood that any ad hoc evaluations would have been unlawful and improper had their purpose been to retaliate against plaintiff. The reprehensibility of defendants' conduct is evidenced by their agents' participation in entering unwarranted LINK ratings, human resources and legal's involvement in subsequent changes to documents and evaluations concerning plaintiff's work performance.

### The Ratio Between Actual and Punitive Damages

Rather than simply concede that a ratio of 9 to 1 is clearly in keeping the vast majority of case law, the Defendant has chosen to argue that the compensatory damages are egregious. As pointed out earlier, the compensatory damage award of $102,850.00 is not excessive. With that in mind, the ratio between punitive damages and compensatory damages is extremely reasonable. See *Kimbrough v. Loma Linda Development, Inc*.,183 F3d 782, 785 (8th Cir.1999)(10:1 not excessive as a matter of law)

Moreover, the Court should not concern itself with whether the jury considered attorneys' fees in assessing punitive damages. In *Grabinski v. Blue Springs Ford Sales, Inc*., 203 F.3d 1024 (8th Cir.2000) the Court concluded that the trial court abused its discretion when it denied attorney's fees simply because it felt that the

punitive damages award was "generous" and because it did not want to " 'pad' the punitive damage award with a fee award in this case."  As the Court noted,

> "the results that a plaintiff achieves are a critical consideration in deciding whether to award attorney's fees…Awarding attorney's fees to successful plaintiffs is indeed the rule rather than the exception…Denying fees because Ms. Grabinski received "generous" punitive damages stands the matter entirely on its head because it punishes her for her success, the very thing that is supposed to be rewarded.  *Grabinski* at 1028.

Simply, Plaintiff should not be punished because the Court may have reservations about the jury's potential consideration of attorneys' fees in determining the punitive damages in this case.

### C, D, E.
### <u>A New Trial Should Not be Granted Because of The Court's Decision to Allow Plaintiff to Present Evidence of a Link Change, Plaintiff's complaints in 1987, and Refusal to Admit Evidence of Comments Made by Plaintiff</u>

"A trial court's evidentiary rulings are reviewed under an abuse of discretion standard." *Quallev v. Clo-Tex Intern.. Inc.,* 212 F.3d 1123, 1127 (8th Cir. 2000) (citing *United HealthCare Corn. v. American Trade Ins. Co.. Ltd.,* 88 F.3d 563, 573 (8th Cir. 1996); *Maddox v. Patterson*, 905 F.2d 1178, 1179 (8th Cir. 1990); *Adams v. Fupua lndus.,* 820 F.2d 271, 273 (8th Cir.1987)). "With respect to a trial court's ruling that admits evidence, error may not be predicated on such a ruling unless a substantial right of the party is affected and a timely objection or motion to strike appears of record stating the specific ground for objection." *Quallev,* 212 F.3d at 1127 (citing Fed.R.Evid. 103(a)).

"Furthermore, no error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for

vacating modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Quallev,* 212 F.3d at 1127 (citing Fed.R.Civ.P. 61).

"Thus, '[w]here the district court errs in admitting evidence, we will only grant a new trial or set aside a verdict if there is a clear and prejudicial abuse of discretion.'" *Quallev*, 212 F.3d at 1127-28 (citing *Lovett ex rel. Lovett v. Union Pac. R.R. Co.,* 201 F.3d 1074, 1080 (8th Cir.2000)). "An abuse of discretion occurs when the error prejudicially influences the outcome of the case, and the burden of showing prejudice rests on the party asserting it." *Qualley*, 212 F.3d at 1128 (citing *Lovett ex rel. Lovett v. Union Pac. R.R. Co.*, 201 F.3d 1074, 1080 (8th Cir.2000); *Tvlerv. White*, 811 F.2d 1204, 1207 (8th Cir.1987)).

A new trial should not be granted on the basis of the erroneous admission of evidence unless a timely objection is made at trial or the evidentiary ruling was plain error. *Athey v. Farmers Ins. Exchange*, 234 F.3d 357, 362 (8th Cir. 2000) (citing Fed. R. Evid. 103(a); *Qualley v. Clo-Tex Int'l. Inc.,* 212 F.3d 1123, 1127 (8th Cir.2000)).

Simply put, none of these evidentiary rulings prejudiced defendants. As the Court noted in denying summary judgment, evidence of the change of plaintiff's LINK rating demonstrated some evidence of pretext as to the original 5 rating and repeatedly stated during the course of trial that such a change showed that the original rating was wrong. It was for the jury to decide if the "error" in rating plaintiff a 5 was an intentional act of retaliation or a clerical problem. Obviously, the jury felt the original rating of 5 which

was not desired by plaintiff's supervisor, coupled with Rob Hammond's untruthful statement that plaintiff was rated a 5 by Bob Brown, was an intentional act of retaliation. This evidence was crucial to plaintiff's case in chief.

The Court's determination to allow evidence concerning an incident in 1987 does not warrant a new trial. This evidence was important to demonstrate the reasons to the jury of plaintiff's initial reluctance to participate in any proceedings with human resources. Counsel for plaintiff did not attempt to use this evidence in any way but to show to the jury the reasons for plaintiff's delay.

The Court was correct in excluding any comments made by plaintiff with regard to the MCI-Worldcom merger. Defendants claim that this evidence was important because it would have helped the jury better understand the abrupt relationship between Hammond and plaintiff and plaintiff's unprofessional behavior. This argument fails to address the fact that Jarrod Nichols was concerned about Hammond's treatment of plaintiff at the very first meeting he attended. Mr. Nichols was so concerned that he brought this tension to the attention of Bob Brown. Such tension existed prior to any statements made by plaintiff. The statements would be offered into evidence by defendant only to portray plaintiff as an elitist.

## III. THE JURY'S AWARD IS NOT EXCESSIVE AND SHOULD NOT BE REMITTED

As the Court is aware, Rule 51 of the Federal Rules of Civil Procedure specifically provides that "'no party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." *Cross v. Cleaver,* 142 F.3d 1059, 1067 (8th Cir. 1998) (citing Fed.R.Civ.P. 51). Though

defendants did object to the submission of a punitive damage instruction and its language omitting a *Kolstad* defense, they did not object to the burden of proof standard within the instruction.

As a result, Defendants claim that the proper standard under the MHRA was not submitted to the jury and therefore, plaintiff "opted" to pursue a punitive damage award under Title VII standards and cites in support of this position, *Gray v. Tyson Foods, Inc*., 46 F.Supp.2d 948 (W.D.Mo.1999). In *Gray* however, the Court specifically dealt with the issue of the proper standard of proof at an instruction conference.

> During the instruction conference, the proper burden of proof for a punitive damage claim under the MHRA was discussed. Because none of us, including plaintiff's attorney, thought that a punitive damage verdict in excess of $300,000 was a possibility, we agreed that the lower burden of proof would be used in order to simplify the jury instructions. **We agreed that should a higher punitive damage verdict be returned by the jury, and if it were determined that a higher burden of proof was required under the MHRA, the amount over the maximum allowed by § 1981a would have to be vacated**. *Gray* at 958.

Defendants certainly objected to the instruction not containing *Kolstad* language. However, Plaintiff and defendants did not specifically address this issue of whether the instruction was submitted under the MHRA or Title VII during the instruction conference. As such, defendants have waived any error in the instruction.

Similar issues have arisen in other cases where the jury instructions did not specifically identify under what theory the instruction was presented to the jury. Indeed, this Court has been faced with this issue on another occasion in *Morse v. Southern Union Co*., 174 F.3d 917 (8th Cir.1999). On appeal and in post-trial motions, Southern Union alleged the jury was improperly instructed on the standard for awarding punitive damages under the MHRA. The jury instruction stated that a preponderance of the

evidence was required. The parties, however, did not object to this aspect of the submitted instruction. The claim therefore was waived and reviewed only for plain error.  Under plain error review, courts reverse "only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." *Cross,* 142 F.3d at 1068 (internal quotations omitted). Plain error review is "narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Ryther,* 108 F.3d at 847 (internal quotation omitted).

In denying this point on appeal in *Morse*, the Eighth Circuit stated:

Assuming, without deciding, that the jury instruction incorrectly stated the legal standard for punitive damages under the MHRA, the error does not reach the level required for reversal under plain error review. Because neither party objected to the instruction, the error was invited by the parties…This error did not seriously affect the fairness of the trial, its integrity, or its public reputation. *See Baker v. Delo,* 38 F.3d 1024, 1026 (8th Cir.1994) (finding no plain error when instruction stated incorrect legal standard); *Turner v. White,* 980 F.2d 1180, 1182 (8th Cir.1992) (same). The error also did not prejudice the substantial rights of Southern Union nor would a miscarriage of justice result if this error were left uncorrected. We find no plain error in this jury instruction. *Morse* at 926, 27.

WHEREFORE, Plaintiff respectfully requests that defendants' motions be denied.

**SANDERS, SIMPSON, FLETCHER & SMITH, L.C.**

By__S/ Kirk D. Holman_____
Michael R. Fletcher #47495
Daniel W. Craig #43833
Kirk D. Holman #50715
1125 Grand Avenue, Suite 1400
Kansas City, Missouri 64106
(816) 471-6444
FAX: (816) 471-6664
ATTORNEYS FOR PLAINTIFF

I hereby certify that a copy of
the foregoing was mailed electronically
upon the following:

Karen R. Glickstein, Esq.
Monica M. Fanning, Esq.


S/ Kirk D. Holman